**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re*<br><br>PRIME CAPITAL VENTURES, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-11029 (PGR) |
| FRED STEVENS, as Plan Administrator, and as assignee of third-party claims by creditor victims of Prime Capital Ventures, LLC,<br><br>Plaintiff,<br><br>*-against-*<br><br>RBC CAPITAL MARKETS, LLC and ROYAL BANK OF CANADA,<br><br>Defendants. | Adv. Pro. No. 26-90060 |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS RBC CAPITAL MARKETS, LLC AND ROYAL BANK OF CANADA'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W. 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
David Litterine-Kaufman
Harry F. Murphy
Alexandra M. Zablocki

*Counsel to RBC Capital Markets, LLC and Royal Bank of Canada*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

RELEVANT FACTUAL BACKGROUND ........ 3

ARGUMENT ........ 9

I. The Aiding-and-Abetting Claims Must Be Dismissed Because the Complaint Does Not Adequately Allege Actual Knowledge or Substantial Assistance ........ 10

   A. The Aiding-and-Abetting Claims Must Be Dismissed Because the Complaint Does Not Allege Actual Knowledge by RBCCM of Any Underlying Tort ........ 11

   B. The Aiding-and-Abetting Claims Must Be Dismissed Because the Complaint Does Not Allege Substantial Assistance by RBCCM of Any Underlying Tort ........ 14

II. The Actual Fraudulent Transfer Claim Must Be Dismissed Because the Complaint Does Not Allege Any Facts That Could Establish Fraudulent Intent ........ 16

III. The Claims for Attorneys' Fees and Prejudgment Interest Should Be Dismissed Because They Are Components of a Damages Award, Not Standalone Claims, and the Claims on Which They Depend Fail ........ 19

IV. Dismissal With Prejudice Is Appropriate Because the Plan Administrator Would Have Already Cured These Infirmities If It Were Possible ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**CASE** **PAGE(S)**

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*,
820 F. Supp. 2d 510 (S.D.N.Y. 2011)....11

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010) .... 12

*Armstrong v. McAlpin*,
699 F.2d 79 (2d Cir. 1983) .... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).... 9

*Barbagallo v. Marcum LLP*,
820 F. Supp. 2d 429 (E.D.N.Y. 2011) ....11, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).... 9

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021) ....11, 13

*Dillon v. Militano*,
731 F. Supp. 634 (S.D.N.Y. 1990) .... 15

*Heinert v. Bank of America, N.A.*,
410 F. Supp. 3d 544 (W.D.N.Y. 2019) .... 15

*In re Agape Litig.*,
773 F. Supp. 2d 298 (E.D.N.Y. 2011). .... 9

*In re Bayou Grp., LLC*,
362 B.R. 624 (Bankr. S.D.N.Y. 2007).... 17, 19

*In re Bernard L. Madoff Inv. Sec. LLC*,
525 B.R. 871 (Bankr. S.D.N.Y. 2015).... 17

*In re Direct Access Partners, LLC*,
602 B.R. 495 (Bankr. S.D.N.Y. 2019)........................................................................ 18

*In re Dreier LLP*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011)................................................................... 17, 18

*In re Furs by Albert & Marc Kaufman, Inc.*,
No. 03-41301 SMB, 2006 WL 3735621 (Bankr. S.D.N.Y. Dec. 14, 2006)............................ 19

*In re Nanobeak Biotech Inc.*,
656 B.R. 350 (Bankr. S.D.N.Y. 2024)........................................................................ 19

*In re Palladino v. Sacred Heart Univ.*,
556 B.R. 10 (Bankr. D. Mass. 2016).......................................................................... 18

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005) ........................................................................................ 9

*In re Trib. Co. Fraudulent Conv. Litig.*,
10 F.4th 147 (2d Cir. 2021)........................................................................................ 18

*JP Morgan Chase Bank v. Winnick*,
406 F. Supp. 2d 247 (S.D.N.Y. 2005) ....................................................................... 14

*Kirschner v. Bennett*,
648 F. Supp. 2d 525 (S.D.N.Y. 2009) ....................................................................... 12

*Kolbeck v. LIT Am., Inc.*,
939 F. Supp. 240 (S.D.N.Y. 1996) ..............................................................................11

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)........................................................................................11

*City of Syracuse v. Loomis Armored US, LLC*,
900 F.Supp.2d 274, 302 n.7 (N.D.N.Y. 2012)............................................................11

*Mazzaro de Abreu v. Bank of Am. Corp.*,
525 F. Supp. 2d 381 (S.D.N.Y. 2007) .................................................................. 15, 16

*McLaughlin v. Anderson*,
962 F.2d 187 (2d Cir. 1992) .......... 10

*Pentacon BV v. Vanderhaegen*,
725 F. Supp. 3d 350 (S.D.N.Y. 2024) .......... 11

*Regnante v. Sec. & Exch. Offs.*,
134 F. Supp. 3d 749 (S.D.N.Y. 2015) .......... 20

*Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*,
121 F. Supp. 3d 321 (S.D.N.Y. 2015) .......... 14, 15

*Rosner v. Bank of China*,
349 F. App'x 637 (2d Cir. 2009) .......... 13

*Rosner v. Bank of China*,
528 F. Supp. 2d 419 (S.D.N.Y. 2007) .......... 14

*Ryan v. Hunton & Williams*,
No. 99-cv-5938 (JF), 2000 WL 1375265 (E.D.N.Y. Sep. 20, 2000) .......... 16

*Samuel M. Feinberg Testamentary Trust v. Carter*,
652 F. Supp. 1066 (S.D.N.Y. 1987) .......... 11

*Stevens v. Berkshire Bank*,
No. 5:25-cv-1256 (N.D.N.Y. Sep. 18, 2026), .......... passim

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) .......... 10

*Winkler v. Battery Trading, Inc.*,
89 A.D.3d 1016 (2d Dep't 2011) .......... 16

**STATUTES**

11 U.S.C. § 548(a)(1)(A) .......... 16

11 U.S.C. § 550(a) .......... 19

28 U.S.C. § 1961 .......... 20

NY CPLR § 5001 (2025) ........................................................................................................ 20

NY Debt. & Cred. L. § 276-a.................................................................................................. 19

Defendants RBC Capital Markets, LLC ("***RBCCM***") and Royal Bank of Canada ("***RBC***," and together with RBCCM, "***Defendants***") respectfully move (this "***Motion***") pursuant to Federal Rules of Civil Procedure 12(b)(6), made applicable herein by Federal Rule of Bankruptcy Procedure 7012(b), for dismissal with prejudice of the claims asserted against them in the complaint [Adv. Docket No. 1] (the "***Complaint***" or "***Compl.***") in the above-captioned adversary proceeding (the "***Adversary Proceeding***") by Fred Stevens (the "***Plan Administrator***"), in his capacity as plan administrator and assignee of third-party claims by certain creditors of Prime Capital Ventures, LLC (the "***Debtor***" or "***Prime Capital***").

## PRELIMINARY STATEMENT

Defendants are leading financial institutions with millions of banking and brokerage customers around the world. The Complaint attempts to paint their provision of routine financial services as aiding and abetting torts committed by Berone (defined below) and by the Debtor itself. It further seeks to invalidate—as actual fraudulent transfers—the Debtor's repayment to RBC of principal and interest owed on a market-rate line of credit and the grant of an associated security interest. Because all of the claims relate to the fraud of non-parties, the Complaint must plausibly demonstrate Defendants' ***actual knowledge*** of the underlying wrongful acts. But the Complaint offers only allegations of purported "red flags" and "irregular" and "suspicious" transactions, which fall well short of establishing Defendants' actual knowledge of, and substantial participation in, the underlying torts or the Debtor's intention to hinder, delay, or defraud creditors through its repayments on the line of credit. The Court should dismiss with prejudice all of the claims asserted in the Complaint.

***The Aiding and Abetting Claims Fail Because They Rely on Constructive Knowledge Instead of Actual Knowledge and Ordinary-Course Financial Services Instead of Substantial Assistance.*** To state an aiding and abetting claim that sounds in fraud, the Complaint must allege

actual knowledge by RBCCM of the underlying frauds. "Should have known" does not suffice, yet that is all the Complaint offers. At most, the Complaint alleges constructive notice based on "monitoring systems," "patterns," and "anomalies," which the Complaint itself admits are merely "indicative" of "potentially" improper conduct. Compl. ¶ 99. That is not enough.

The aiding and abetting claims also require factual allegations that RBCCM provided substantial assistance to the underlying frauds. But the only conduct by RBCCM alleged—the provision of ordinary course financial services to the Debtor and Berone and purported failure to debank them sooner than required—cannot establish substantial assistance for three reasons. *First*, the case law is clear that providing ordinary-course financial services does not constitute substantial assistance for a customer's fraud. *Second*, an alleged failure to act does not constitute substantial assistance absent a duty to act, which did not exist here. *Third*, RBCCM's financial services did not proximately cause any of the underlying torts alleged in the Complaint.

Another court in this District recently dismissed with prejudice strikingly similar aiding and abetting claims brought by the same Plan Administrator. *See Stevens v. Berkshire Bank*, No. 5:25-cv-1256, slip op. at 23-31 (N.D.N.Y. Sep. 18, 2026), ECF No. 41, appended hereto as Exhibit A ("***Berkshire Bank***"). There, as here, the Plan Administrator asserted claims for aiding and abetting a Ponzi scheme against a bank where the alleged fraudster had maintained accounts, citing the bank's KYC processes and purportedly suspicious account activity in an attempt to establish scienter. And there, as here, the Plan Administrator relied on the provision of financial services as purported substantial assistance to the underlying fraud. Judge Hurd concluded that those allegations were insufficient to adequately allege the actual knowledge or substantial assistance elements of the Plan Administrator's aiding and abetting claims. This Court should

follow that well-reasoned opinion and dismiss the aiding and abetting claims (Counts 3 through 7) on the same grounds.

***The Actual Fraudulent Transfer Claim Fails Because the Ponzi Presumption Does Not Apply and the Complaint Contains No Factual Allegations to Support a Fraudulent Intent or Effect in Repaying the RBC Line of Credit.*** To state a claim for actual fraudulent transfer, the Complaint must allege facts that establish the Debtor's actual fraudulent intent and that the transfer in question hindered, delayed, or defrauded creditors. Here, the Complaint eschews any such explanation and relies instead on a summary statement that the order confirming the Debtor's plan included a finding that the Debtor was a Ponzi scheme (often referred to as a "Ponzi presumption"). Compl. ¶¶ 76-77. But the transfers attendant to the RBC line of credit were not payments of fictitious profits to earlier investors in the Ponzi scheme, which is the ambit of the Ponzi presumption. They were a grant of a security interest to secure, and repayment of funds admittedly lent under, a bona fide line of credit. The Ponzi presumption does not apply to such transactions, and the Complaint offers no factual allegations whatsoever to support a finding of actual fraud in connection with these transfers. The actual fraudulent transfer claim and associated demand for attorneys' fees (Counts 1 and 2) must be dismissed.

## RELEVANT FACTUAL BACKGROUND[1]

### A. The Parties

#### 1. The Debtor and Its Management

The Debtor purported to be a legitimate alternative (or nonbank) lender. Compl. ¶ 32. The Debtor in fact was an advance-pay lending and Ponzi scheme created and operated by its principal,

[1] The factual background set forth below is drawn from the allegations in the Complaint, which are assumed to be true for purposes of this Motion.

Kris Roglieri ("***Roglieri***"), and his co-conspirator, Kimberly Humphrey ("***Humphrey***"). *Id.* at Prelim. Stmt.

On January 12, 2024, following the dismissal of an involuntary chapter 7 proceeding, a federal equity receiver was appointed for the Debtor by the United States District Court for the Northern District of New York. *Id.* ¶¶ 64-65. The receiver filed a voluntary chapter 11 proceeding for the Debtor on May 14, 2024; however, the case was dismissed upon a finding that the receiver did not have authority to file it on Prime Capital's behalf. A new voluntary chapter 11 petition was filed on September 16, 2024. *Id.* ¶¶ 55-71. On June 5, 2025, the U.S. Trustee appointed a chapter 11 trustee for the Debtor. *Id.* ¶ 72. On February 25, 2026, the Debtor's plan of liquidation was confirmed. *Id.* ¶ 73. The confirmation order included a finding that Prime Capital "'was an advance pay/Ponzi scheme since its formation.'" *Id.* ¶ 76.

On November 13, 2025, Roglieri pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and submitted to forfeiture of specified property and entry of a money judgment in favor of the U.S. Government. *Id.* ¶ 82. Humphrey entered guilty pleas in June 2025. *Id.* ¶ 85.

### 2. The Berone Parties

Berone Capital, LLC ("***Berone Capital***") is or was a Delaware limited liability company owned and/or operated by Jeremiah Beguesse ("***Beguesse***") and Fabian Stone ("***Stone***"). Compl. ¶ 10. Berone Capital Fund, LP (the "***Berone Fund***," and together with Berone Capital, "***Berone***") is or was a private and unregistered pooled investment vehicle formed as a Delaware limited partnership. *Id.* ¶ 11. Berone was a "registered investment advisor" and "owes a fiduciary duty to its clients," which (per Beguesse) eventually included Prime Capital. *Id.* ¶ 123.

Berone engaged in fraudulent activity, of which Prime Capital was a victim. *Id.* ¶¶ 114-22, 125-30.

**3. Defendants and Their Regulatory Compliance Regimes**

RBC is a Canadian legal entity that conducts business as a bank in the United States. Compl. ¶ 20. RBCCM is a limited liability company organized and existing under the laws of Minnesota and is a broker-dealer registered to do business in the United States. *Id.* ¶ 19. RBCCM is indirectly wholly owned by RBC. *Id.* RBCCM provided financial and securities services to both Prime Capital and Berone, while RBC provided banking services to Prime Capital alone.

Defendants maintain various bank secrecy, anti-money laundering, and KYC compliance programs, including account activity monitoring systems. *Id.* ¶¶ 92-104.

**B. The Berone Accounts and Berone's Fraud on Prime Capital**

On or around November 5, 2021, Berone entered into an Investor Advisor Service Agreement with RBCCM division RBC Advisor Services. Compl. ¶ 105. On February 4, 2022, a "New Account Application" was submitted to RBCCM on behalf of Berone, and a "Certification of Investment Powers" declaration was given indicating that Berone could enter into borrowing transactions with RBCCM and grant a security interest in an account in favor of RBCCM with the noted account number 9G6-0001. *Id.* ¶ 107. The New Account Application named Berone Capital as "Advisor" with a UPS Store mailing address. *Id.* ¶ 108. The specific account was for Berone Fund as a client of Berone Capital, with a personal residence as the listed address, and with Berone Capital also acting as advisor. *Id.* ¶ 109. The account application included an employer identification number for the Berone Fund, a telephone number, and Stone's birthdate and social security number, but did not include certain other information about its business and operations. *Id.* ¶ 110. In May 2022, two accounts were opened at RBCCM for Berone: a "settlement ledger" account for Berone Capital (the "***Berone RBC Settlement Account***") and an advisor account for the Berone Fund with Berone Capital as advisor (the "***Berone RBC Account***"). *Id.* ¶ 111.

On May 3, 2022, $1,000,000 was deposited into the Berone RBC Account, of which over $600,000 was transferred out to other Berone-associated accounts over the following four months. *Id.* ¶ 112.

On October 24, 2022, Prime Capital transferred $20 million to the Berone RBC Account, which was substantially more than past deposits into the account. *Id.* ¶¶ 122, 135. Between October 26, 2022 and November 8, 2022, Berone withdrew approximately $15.3 million from the Berone RBC Account via a series of three transfers. *Id.* ¶¶ 125-26, 128. Additional amounts were withdrawn between January 23, 2023, and August 8, 2023. *Id.* ¶ 137. The Complaint alleges a large volume of wire transfers as compared to securities transactions in the Berone RBC Account. *Id.* ¶ 136; *see also* ¶ 142.

The Plan Administrator alleges the following as "red flags" concerning transfers from the Berone RBC Account: (a) none of the transfers was for the purpose of holding, clearing, settling, or transacting in securities within the account; (b) the $20 million deposit was from a third party with which Berone had no known prior relationship and in an amount significantly larger than prior deposits; (c) three days after the deposit was made, Berone sent round-number wire transfers to outside non-brokerage accounts; (d) two weeks after the deposit was made, Berone sent a third round-number wire transfer to a different escrow account; (e) in 2023, Berone sent a series of wire transfers aggregating to approximately $3.1 million; and (f) the same individual signed wire transfer forms as both the client and financial advisor attestor. *Id.* ¶ 138. The Complaint alleges that on-platform securities trading, denominated in irregular amounts, was a fraction of the round-dollar wire volume. *Id.* ¶ 143.

In January 2023, Roglieri demanded termination of the Prime Capital-Berone transaction and return of the $20 million deposit. *Id.* ¶ 146. Berone "doctored bank statements for the Berone

RBC Account to show that Prime Capital's funds were still largely intact when in fact, the funds had been transferred," and transmitted these false bank statements to Prime Capital. *Id.* ¶ 148. There is no allegation that either RBCCM or RBC was aware of—much less corroborated—the doctored bank statements. Prime Capital eventually initiated a lawsuit against the Reign Parties (as defined in the Complaint) (not Berone) to obtain recovery of the $20 million, but the case has been dormant since June 2023. *Id.* ¶¶ 153-154. On October 16, 2023, Berone returned $1,865,000 to Prime Capital. *Id.* ¶ 172.

On March 4, 2024, RBCCM sent a letter to Berone Capital and its receiver terminating the customer relationship. *Id.* ¶ 183.

### C. The Prime Capital Account and Prime Capital's Fraud on Individual Victims

In June 2023, Berone and Prime Capital initiated the process to establish an investor advisor account at RBCCM for Prime Capital under the Berone Capital advisor umbrella. Compl. ¶ 157. The new account application listed Prime Capital's employer identification number, a telephone number, and Roglieri's birthday, social security number, and home address, and also included a copy of Roglieri's passport and a copy of an unsigned operating agreement. *Id.* ¶ 160. The Complaint alleges that RBCCM did not conduct additional due diligence on Prime Capital after receiving the new account application. *Id.*

On September 21, 2023, ER Tennessee LLC ("***ER Tennessee***") transferred $14.25 million to Prime Capital's RBCCM account. *Id.* ¶ 161. Prime Capital transferred $7 million to an account at Farmers State Bank for the stated purpose "RETURN OF FUNDS" five days later. *Id.* ¶ 162.

### D. The RBC-Prime Capital Loan

On October 3, 2023, Prime Capital applied for a $6 million line of credit from RBC (the "***RBC LOC***"), pledging the remaining balance in its accounts with RBCCM (approximately $7.25 million) as security. Compl. ¶ 164. The Complaint alleges that "[v]irtually nothing was

completed on the Line of Credit Application filled out and signed by Roglieri on behalf of Prime Capital," and the stated purpose of the loan was "General liquidity purposes." *Id.* ¶ 165. The Complaint further alleges that an internal document by RBC titled "ETR – BASIC REPORT," which indicated that KYC analysis for Prime Capital was "Current & Complete," was stamped submitted on September 27, 2023, despite "no indication that RBC had conducted any meaningful KYC analysis" and notwithstanding several lawsuits pending against Prime Capital. *Id.* ¶¶ 167-68.

Prime Capital drew $5 million on the RBC LOC on October 11, 2023, and the remaining $1 million on October 16, 2023. *Id.* ¶ 170. The Complaint does not challenge that RBC in fact lent these amounts to Prime Capital or that Prime Capital received them. The RBC LOC accrued interest at an annual rate of 7%. *Id.* ¶ 171. The Complaint does not allege that this interest rate was over-market for such loans.

On January 24, 2024, RBC demanded repayment of the outstanding RBC LOC from Prime Capital in the amount of $6,064,700.18. *Id.* ¶ 175. On January 31, 2024, pursuant to the security interest Prime Capital had granted to RBC, RBC deducted $6,065,813.73 from the funds then in the Prime Capital RBC Account. *Id.*

### E. The Plan Administrator's Role and Commencement of the Adversary Proceeding

On February 25, 2026, Prime Capital's plan of liquidation (the "***Plan***") went effective. Compl. ¶ 73. Under the Plan, Prime Capital's creditors could assign to the Plan Administrator their claims relating to the conduct of Prime Capital's business, including claims against banks used by Prime Capital or Roglieri and claims against third parties that, if pursued by Prime Capital or Roglieri, would be subject to the defense of *in pari delicto* or the *Wagoner* Rule. *Id.* ¶ 189.

Several creditors (the "***Assigning Creditors***") assigned their claims, and the Plan Administrator now asserts them against Defendants. *Id.* ¶¶ 190-91.

On September 15, 2026, the Plan Administrator initiated the Adversary Proceeding by filing the Complaint, which asserts causes of action on behalf of the Debtor's estate and in the Plan Administrator's capacity as assignee of claims of the Assigning Creditors.

**ARGUMENT**

Under Federal Rule of Civil Procedure 12(b)(6), made applicable here by Bankruptcy Rule 7012, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While the Court must accept well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Because the Complaint asserts claims sounding in "fraud or mistake," it must additionally meet Federal Rule of Civil Procedure 9(b)'s requirement to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7009). The Rule 9(b) heightened pleading standard applies both to fraudulent transfer claims, *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005), and to claims "premised on aiding and abetting," *In re Agape Litig.*, 773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011).

Furthermore, "Rule 9(b) applies equally to claims alleging aiding and abetting fraud, . . . aiding and abetting breach of fiduciary duty sounding in fraud, . . . and aiding and abetting conversion premised on fraud. Accordingly, '[a] plaintiff alleging aiding and abetting claims

sounding in fraud must also plead the elements of aiding and abetting with particularity.'" *In re Agape Litig.*, 773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011) (internal citations and quotations omitted).

To comply with Rule 9(b), a complaint must "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)).

While Rule 9(b) permits state of mind to be "averred generally," courts "must not mistake" this more relaxed standard "for a license to base claims of fraud on speculation and conclusory allegations." *Berkshire Bank* at 21 (internal citations omitted). Instead, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Id.*

The Plan Administrator asserts claims in two categories: aiding and abetting various torts (including conversion, fraud, and breach of fiduciary duty) and actual fraudulent transfer. The Complaint's meager factual allegations concerning RBCCM and RBC fail to meet the bar set by Rule 12(b)(6), much less the heightened standard of Rule 9(b).

This pleading deficiency is not merely a failure of drafting, it is clear from what the Plan Administrator does allege that no facts exist that could support the claims asserted. Defendants provided routine banking and financial services, nothing more. They did not engage in conduct that could give rise to aiding-and-abetting liability or possess actual knowledge of any torts committed by Prime or Berone. The Complaint is incurably deficient and must be dismissed with prejudice.

## I. THE AIDING-AND-ABETTING CLAIMS MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT ADEQUATELY ALLEGE ACTUAL KNOWLEDGE OR SUBSTANTIAL ASSISTANCE

As the Supreme Court has observed, regardless of the specific legal context, "[t]he phrase 'aids and abets' [. . .] refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023) (discussing commonality of "conceptual core that has animated aiding-and-abetting liability for centuries" across criminal and tort law). "To establish a claim of aiding and abetting, a party must allege: 1) the existence of a violation by the primary wrongdoer; 2) knowledge of this violation by the aider and abettor; and 3) proof that the aider and abettor substantially assisted in the primary wrong." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 445 (E.D.N.Y. 2011) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983)); *see also Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 535 (S.D.N.Y. 2011) (applying test to claim for aiding and abetting conversion); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (applying test to claim for aiding and abetting fraud); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) (applying to test to claim for aiding and abetting breach of fiduciary duty).

### A. The Aiding-and-Abetting Claims Must Be Dismissed Because the Complaint Does Not Allege Actual Knowledge by RBCCM of Any Underlying Tort

To establish an aiding and abetting claim, "[a]ctual knowledge, not mere notice or unreasonable unawareness, is . . . essential." *Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F. Supp. 1066, 1082 (S.D.N.Y. 1987); *see also City of Syracuse v. Loomis Armored US, LLC*, 900 F.Supp.2d 274, 302 n.7 (N.D.N.Y. 2012) ("New York 'has not adopted a constructive knowledge standard for imposing aiding and abetting liability.'") (quoting *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998)). A plaintiff cannot meet his burden to plead "actual knowledge" with allegations of "constructive knowledge,"

"ignor[ance] [of] obvious warning signs," "recklessness," or "willful blindness" alone. *Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350, 389 (S.D.N.Y. 2024), *reconsideration denied*, No. 23 CIV. 2172 (KPF), 2024 WL 3835334 (S.D.N.Y. Aug. 15, 2024). "Allegations that the defendant 'should have known of the conduct' are insufficient to raise an inference of actual knowledge." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) (internal quotations omitted); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) ("[R]eckless disregard will not suffice.").

Instead, "[t]o survive a motion to dismiss, . . . the [plaintiff] must allege facts giving rise to a 'strong inference' of defendant's actual knowledge of the underlying harm, or the conscious avoidance of the same such that 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'" *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) (internal citations omitted); *see also Anwar*, 728 F. Supp. 2d at 442 ("Plaintiffs must allege a strong inference of actual knowledge or conscious avoidance."). "The requisite 'strong inference' of fraud can be demonstrated 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Berkshire Bank* at 21-22 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

While long on details of the alleged torts by Prime Capital and Berone, the only factual allegations in the Complaint pertaining to RBCCM consist of purportedly "suspicious" transfers made through Prime Capital's and Berone's RBCCM accounts and information omitted by them from certain account documentation—nothing more.

The Complaint fails to allege actual knowledge of the underlying violation for any of Counts 3 and 4 (aiding and abetting conversion), Counts 5 and 6 (aiding and abetting fraud), or Count 7 (aiding and abetting breach of fiduciary duty), instead relying on the alleged presence of "red flags" and the mere existence of a system intended to detect them. For example, in Counts 3 and 4, the Plan Administrator claims that RBCCM had actual knowledge of both Berone's conversion of Prime Capital's $20 million deposit and Prime Capital's conversion of its victims' funds based on its "access to and observation of highly suspicious activity" in the perpetrators' accounts. Compl. ¶¶ 216, 224. In other words, the Plan Administrator assumes that indicia of suspicious activity in a related account establish actual knowledge of conversion committed by, and through an account owned by, a completely separate entity. *See also id.* ¶¶ 232, 241 (relying on alleged "observ[ation] and monitor[ing]" of "suspicious transactions" by Berone for aiding and abetting fraud claims); *id.* ¶ 251 (relying on allegation that RBCCM "was well aware of Berone Capital's fiduciary obligations to its clients like Prime Capital" for aiding and abetting breach of fiduciary duty claim).

That is not the law. Instead, "[a]llegations that the defendant 'should have known of the conduct' are insufficient to raise an inference of actual knowledge, as are allegations of a 'bank's negligent failure to identify warning signs of fraudulent activity . . . ." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d at 412 (internal quotations omitted). That is true "even where such signs converge to form a veritable forest of red flags." *Id.*; *see also Rosner v. Bank of China*, 349 F. App'x 637, 639-40 (2d Cir. 2009) ("[T]he facts alleged in Rosner's complaint only go so far as to suggest that BOC should have known that something was amiss . . . . As the district court held, such a showing is insufficient to support an aiding-and-abetting claim under New York law."). Because even a "veritable forest of red flags" does not establish actual knowledge as a matter of law, the handful

of wire transfers and basic account documentation alleged here clearly cannot. *Berdeaux*, 561 F. Supp. 3d at 412.

The Complaint's allegation that "continuing to earn interest, fees, and commissions" provided a motive for RBCCM to ignore suspicious activity also cannot establish a strong inference of fraudulent intent. Compl. ¶ 139. Courts that have considered this argument "have held that 'a plaintiff must allege more than an interest in bank fees to create a reasonable inference of fraudulent intent.'" *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 426 (S.D.N.Y. 2007) (quoting *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 388-89 (S.D.N.Y. 2007)). RBCCM stood to gain nothing more than standard fees and interest from servicing Berone's and Prime Capital's accounts, which is insufficient as a matter of law to establish a strong inference of fraudulent intent.

Because the Complaint lacks well-pled factual allegations that establish a strong inference of scienter, Counts 3, 4, 5, 6, and 7 must be dismissed.

**B. The Aiding-and-Abetting Claims Must Be Dismissed Because the Complaint Does Not Allege Substantial Assistance by RBCCM of Any Underlying Tort**

To adequately plead substantial assistance, a complaint must allege that the purported aider and abettor "'affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] [the underlying violation] to proceed.'" *Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321, 338 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) (quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005)); *see also Barbagallo v. Marcum LLP*, 820 F. Supp. 2d at 445 (same) (citing *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 134 (2d Cir. 2008)). "Awareness and approval, standing alone, do not constitute substantial assistance." *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983).

"The substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (internal quotations omitted). "Proximate cause is 'the cause that *directly* produces an event," in contrast to "[i]ts less stringent counterpart, but-for causation, [which] refers to those acts without which the harm would not have occurred." *Ritchie Cap. Mgmt., L.L.C.*, 121 F. Supp. 3d at 338 (internal citations omitted) (emphasis added).

The only affirmative conduct by RBCCM alleged in the Complaint to establish substantial assistance consists of routine financial services. *See* Compl. ¶¶ 217, 225, 233, 243, 252 (relying on allegation that RBCCM processed a large deposit into an account followed by withdrawals in the days thereafter); *id.* ¶ 217 (relying on allegation that RBCCM allowed account to remain open and continued processing transactions after appointment of receiver); *id.* ¶¶ 225, 243 (relying on allegation that RBCCM permitted RBC to assert security interest in account funds to secure line of credit). But courts in this Circuit have been clear that routine financial services such as opening accounts and processing wire transfers do not constitute substantial assistance in the commission of a tort, even if characteristics are alleged to be atypical. *See, e.g.*, *Heinert v. Bank of America, N.A.*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019), *aff'd*, 835 F. App'x 627 (2d Cir. 2020) ("[R]outine matters," such as "making wire transfers, opening accounts, and clearing account holds," "even where they are performed with 'atypical' frequency, are insufficient to support an aiding and abetting claim"); *Mazzaro de Abreu*, 525 F. Supp. 2d at 390 (S.D.N.Y. 2007) ("[T]he 'mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance.'").

The alleged failure by RBCCM to close Berone's and Prime Capital's accounts sooner cannot fill this critical gap because a failure to act can constitute substantial assistance only if the defendant had an "affirmative duty to act.'" *Berkshire Bank* at 22 (quoting *In re Agape Litig.*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011)); *see also Dillon v. Militano*, 731 F. Supp. 634, 639 (S.D.N.Y. 1990) ("[I]naction may be found to be substantial assistance only where the independent duty to act was a duty owed to the defrauded investor.").

With respect to financial institutions in particular, as a general rule, "[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers." *Winkler v. Battery Trading, Inc.*, 89 A.D.3d 1016, 1018 (2d Dep't 2011) (quoting *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 286 (2d Cir. 2006)) (additional internal citations omitted). Indeed, courts in this Circuit have expressly held that failure to close accounts immediately or inform future plaintiffs of suspected fraud does not amount to substantial assistance. *See, e.g.*, *Ryan v. Hunton & Williams*, No. 99-cv-5938 (JF), 2000 WL 1375265, at *10 (E.D.N.Y. Sep. 20, 2000) ("[F]ailing to shut down the accounts sooner or to inform the plaintiffs about the suspected fraud [] do[es] not rise to the level of substantial assistance."). Likewise, "violation of an organization's internal policy with respect to financial transactions does not in and of itself constitute substantial assistance." *Mazzaro de Abreu*, 525 F. Supp. 2d at 391. Indeed, even "[a] violation of a federal regulation . . . does not of itself constitute substantial assistance." *Id.*

In short, the law recognizes that the financial system would grind to a halt if financial institutions were held liable for aiding and abetting the torts of their customers solely because victim funds may flow through accounts they service, even if accompanied by purported "red flags." The Complaint's allegations of processing wire transfers and providing a market-rate secured line of credit cannot justify a departure from this well-established rule.

## II. THE ACTUAL FRAUDULENT TRANSFER CLAIM MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT ALLEGE ANY FACTS THAT COULD ESTABLISH FRAUDULENT INTENT

Section 548(a)(1)(A) of the Bankruptcy Code permits avoidance of "any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer . . . with an actual intent to hinder, delay, or defraud" its creditors. 11 U.S.C. § 548(a)(1)(A). For a fraudulent transfer claim to succeed, "[t]he 'plaintiff must establish the actual fraudulent intent of the transferor/debtor.'" *In re Dreier LLP*, 452 B.R. 391, 423 (Bankr. S.D.N.Y. 2011) (quoting *In re MarketXT Holdings Corp.*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007)).

The Complaint lacks any well-pled factual allegations that could establish the Debtor's fraudulent intent concerning repayment of the RBC line of credit. The allegations of intent it does contain are classic examples of "mere conclusory statements" that courts do not credit on a motion to dismiss. *See, e.g.*, Compl. ¶ 198 ("Transfers were made intentionally by Prime Capital and its principals in furtherance of Prime Capital's Ponzi and advance pay lending fraudulent scheme."); *id.* ¶ 205 ("Transfers were made by Prime Capital, at the direction of its principal, with actual intent to hinder, delay, and/or defraud Prime Capital's creditors and victims, and individuals and entities to which Prime Capital would become obligated.").

Instead, the Plan Administrator appears to rely on the so-called "Ponzi presumption" to establish the Debtor's fraudulent intent. *See, e.g.*, *id.* ¶ 76 (alleging that Prime Capital "was an advance pay/Ponzi scheme since its formation"). The Ponzi presumption allows the existence of a Ponzi scheme to serve as demonstration of actual intent to make a fraudulent transfer for transfers made in the course of the Ponzi scheme, because such transfers "'could have been made for no purpose other than to hinder, delay or defraud creditors.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 525 B.R. 871, 892-93 n.21 (Bankr. S.D.N.Y. 2015) (internal citations omitted).

However, the Ponzi presumption does not apply to every transfer made by a fraudulent business. Instead, courts look at whether the challenged payments "were themselves inherently fraudulent and constituted an integral and essential component of the fraudulent Ponzi scheme." *In re Bayou Grp., LLC*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007) (contrasting redemption payments to scheme victims, which were "inherently deceitful," with a disclosed repayment of a valid antecedent debt). That is because the presumption "is based on the peculiar characteristics of a Ponzi scheme, under which every payment made to one investor is necessarily part of the scheme to defraud a new investor, and necessarily part of a scheme that ultimately will leave someone unpaid." *In re Direct Access Partners, LLC*, 602 B.R. 495, 540 (Bankr. S.D.N.Y. 2019). "[I]llegal activity, standing alone, does not support a presumption that payments made by a business are made with an actual intent to hinder, delay or defraud the creditors of the business." *Id*. at 541.

When a Ponzi presumption is at the heart of an avoidance claim, "[t]he alleged fraud must relate to *the specific payment or transfer* the plaintiff is seeking to avoid, rather than to the overall course of business." *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 159-60 (2d Cir. 2021) (emphasis added); *see also Dreier*, 452 B.R. at 424 (regarding "the 'Ponzi scheme presumption,' an actual intent to defraud is presumed because the transfers 'made *in the course of a Ponzi Scheme* could have been for no other purpose than to hinder, delay, or defraud creditors.'") (internal quotations omitted) (emphasis added). If the challenged transfers are not made "with actual intent to defraud [the debtor's] creditors," the Ponzi presumption does not apply. *See, e.g.*, *In re Palladino v. Sacred Heart Univ.*, 556 B.R. 10, 14 (Bankr. D. Mass. 2016) (refusing to apply Ponzi presumption to transfers of tuition money by Ponzi schemers to daughter's university because the

transfers were not made "with actual intent to defraud their creditors" notwithstanding guilty pleas on investment fraud).

Here, the Complaint acknowledges that Prime Capital in fact drew $6 million on the RBC line of credit and therefore that the cash transfers to RBC were payments on a valid antecedent debt—not payments of fictitious profits to an early Ponzi scheme investor. Compl. ¶ 170. Furthermore, the cash transfers occurred after Prime Capital was put into receivership, and therefore after the Ponzi scheme had terminated. *Id.* ¶¶ 65, 175. The Ponzi presumption does not apply to repayment of a valid antecedent debt after a Ponzi scheme has collapsed.

The Complaint's attempt to avoid the original grant of a security interest to RBC in Prime Capital's account with RBCCM to secure the line of credit fares no better. The extension of credit in exchange for a lien on a financial account is a commonplace practice in the banking world. The Complaint contains no explanation for how Prime Capital's grant of a security interest to obtain access to credit could be "inherently fraudulent" or "an integral and essential component of the fraudulent Ponzi scheme." *Bayou Grp.*, 362 B.R. at 638. That is because none exists, and the Ponzi presumption does not apply.[2]

## III. THE CLAIMS FOR ATTORNEYS' FEES AND PREJUDGMENT INTEREST SHOULD BE DISMISSED BECAUSE THEY ARE COMPONENTS OF A DAMAGES AWARD, NOT STANDALONE CLAIMS, AND THE CLAIMS ON WHICH THEY DEPEND FAIL

The Complaint seeks attorneys' fees from RBC for the avoidance of actual fraudulent transfers (Count 2) and prejudgment interest and attorneys' fees from both RBC and RBCCM

---

[2] Because the Complaint does not plausibly allege a valid claim for avoidance under section 548, or any other provision, of the Bankruptcy Code, the Plan Administrator cannot recover any transferred property under section 550(a). *See* 11 U.S.C. § 550(a) (permitting recovery of transferred property only "to the extent that a transfer is avoided"); *see also, e.g.*, *In re Furs by Albert & Marc Kaufman, Inc.*, No. 03-41301 SMB, 2006 WL 3735621, at *8 (Bankr. S.D.N.Y. Dec. 14, 2006) ("The Trustee cannot recover the value of the transfer from any of the transferees or beneficiaries unless he first avoids the underlying transfer.").

(Count 8). Attorneys' fees and prejudgment interest are components of a damages award, not standalone claims. *See, e.g.*, *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 356 (Bankr. S.D.N.Y. 2024) (dismissing claim for attorneys' fees and prejudgment interest where associated fraudulent transfer claims were dismissed, because such claim "is not a standalone cause of action").

Furthermore, the statutes cited in the Complaint permit such awards only if a judgment is awarded in the plaintiff's favor. *See* NY Debt. & Cred. L. § 276-a (permitting an award of attorneys' fees if a judgment creditor's representative "recovers judgment avoiding any transfer or obligation"); 28 U.S.C. § 1961(a) (providing that interest "shall be allowed on any money judgment in a civil case recovered in a district court"); NY CPLR § 5001 (2025) ("Interest shall be recovered upon a sum awarded . . ."). Because all of the substantive causes of action asserted in the Complaint fail, there is no basis to award fees or interest. *See, e.g.*, *Regnante v. Sec. & Exch. Offs.*, 134 F. Supp. 3d 749, 773 (S.D.N.Y. 2015) ("Plaintiff's substantive claims here have been dismissed, and therefore there is no basis to award attorney's fees.") (internal citations omitted; collecting cases).

## IV. DISMISSAL WITH PREJUDICE IS APPROPRIATE BECAUSE THE PLAN ADMINISTRATOR WOULD HAVE ALREADY CURED THESE INFIRMITIES IF IT WERE POSSIBLE

The Plan Administrator has served in his role since confirmation of the Debtor's plan and occurrence of the plan effective date on February 26, 2026—nearly *seven months* before filing the Complaint. During these months, the Plan Administrator had unfettered access to the Debtor's files. *See Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 401-1] at Art. V. Yet the Complaint contains only a handful of particularized factual allegations concerning the challenged transactions with RBCCM and RBC, while the vast majority focus instead on the underlying frauds by the Debtor and Berone having nothing to do with these Defendants. That the Plan Administrator could not identify facts capable of supporting his claims

after seven months indicates that the Complaint cannot be cured by amendment. *See Berkshire* at 35 (denying leave to amend where initial complaint was of "speculative and conclusory nature").

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the claims asserted against Defendants in the Complaint should be dismissed with prejudice, and Defendants should be granted such other relief as the Court may deem just and appropriate.

Dated: New York, NY
November 16, 2026

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

*<u>/s/ David Litterine-Kaufman</u>*
David Litterine-Kaufman
Harry F. Murphy
Alexandra M. Zablocki
51 W. 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
dlitterinekaufman@orrick.com
hmurphy@orrick.com
azablocki@orrick.com

*Counsel to RBC Capital Markets, LLC and Royal Bank of Canada*